UNITED STATES FIDELITY & GUAR-
ANTY COMPANY (USFG)

v.

Rudolph J. DiMASSA and Ruggero
D'Onofrio, Defendants,

and

John F. Naulty, Reading Company and/or
Consolidated Rail Corporation, its suc-
cessor, (ConRail), the Pillsbury Compa-
ny, and General Mills, Inc., Third-Party
Defendants.

Civ. A. No. 77–2564.

United States District Court,
E. D. Pennsylvania.

July 16, 1980.

Rudolph J. DiMassa, pro se.

Theodore W. Flowers, Francis P. Devine, III, David E. Sandel, Jr., James D. Fornari, Philadelphia, Pa., Peter F. Baughman, Norristown, Pa., James M. Peck, Philadelphia, Pa., for third-party defendants.

## OPINION

DITTER, District Judge.

This is a suit by a bonding company on an indemnity agreement. Presently before me are motions to dismiss and for summary judgment on behalf of third-party defendants, Reading Company, ConRail, Pillsbury Company, and General Mills, Inc.

This action is one of many spanning almost a decade of litigation involving rail shipments of flour made in 1968 by Pillsbury and General Mills to Western Flour, a regional distributor. In order to enable Western Flour to obtain delivery where proper documents of title were lacking, Reading, the destination rail carrier, required a blanket indemnification bond. Western Flour arranged this bond through United States Fidelity and Guaranty Company (USF&G). To obtain this bond, the principals of Western Flour, Rudolph J. DiMassa and Ruggero D'Onofrio, were each required to sign an agreement to indemnify USF&G.

In May and June, 1968, Reading received flour shipped from Pillsbury and General Mills and delivered it to Western Flour without proper documents of title. Western Flour refused to pay for the flour, and Pillsbury instituted suit against Reading. Reading paid the subsequent judgment which Pillsbury obtained against it. Reading also paid General Mills even though no judgment was outstanding. In 1969, Read-

ing sued USF&G in Philadelphia Common Pleas Court for indemnification under the bond. The court entered summary judgment in favor of Reading which USF&G satisfied by paying the maximum amount, $50,000., under the bond. USF&G then instituted the present lawsuit in 1977 seeking recovery of $50,000. from Western Flour's principals, DiMassa and D'Onofrio, under their individual indemnity agreements with USF&G.

DiMassa filed a third-party complaint against John G. Naulty (attorney for USF&G in the Reading indemnity action), Reading, ConRail, Pillsbury, and General Mills alleging various fraud, anti-trust, and conspiracy theories as defenses to payment under the bond. The third-party defendants, except Mr. Naulty, filed a barrage of motions to dismiss and for summary judgment. For reasons expressed in this memorandum, I will grant the third-party defendants' motions.[1]

DiMassa first claims that General Mills, Pillsbury, Reading, and ConRail conspired to misrepresent the date of certain flour shipments delivered without bills of lading to Western Flour. Specifically, the shipping documents show the following alleged flour shipments:

| Shipper | Car No. | Date Shipped | Delivery to Western | Amount |
|---------|---------|--------------|---------------------|--------|
| Pillsbury | BCK–2050 | 5/9/68 | 5/27/68 | $5,245.50 |
| Gen. Mills | BCK–2938 | 5/14/68 | 5/27/68 | 4,798.35 |
| Pillsbury | BCK–2484 | 5/14/68 | 5/28/68 | 5,901.60 |
| Pillsbury | BCK–2506 | 5/17/68 | 5/28/68 | 7,463.10 |
| Pillsbury | BCK–2871 | 5/16/68 | 5/31/68 | 5,565.25 |
| Pillsbury | BCK–2160 | 5/22/68 | 6/4/68 | 5,737.00 |
| Gen. Mills | BCK–1798 | 5/9/68 | 6/4/68 | 4,699.75 |

DiMassa avers that there was no car BCK 2506 delivered to Western Flour on May 28, 1968, containing flour valued at $7463.10 and to the contrary that the bill of lading was forged. He contends the actual shipment was car BCK 2282 delivered to Western Flour on May 10, 1968, containing the same amount of flour. He feels this alleged misrepresentation is significant because the blanket indemnity bond on which he has been sued states:

1. DiMassa also filed a motion for leave to amend his third-party complaint. I find that the third-party complaint must be dismissed as to Pillsbury, General Mills, Reading, and ConRail even with the proposed amendments.

In the event the required bill(s) of lading, properly endorsed, or other required document(s), as the case may be, is (are) not surrendered to the READING COMPANY within five (5) days, exclusive of Saturdays, Sundays and bank holidays, or, immediately following the day whereon the shipment was delivered, further delivery of shipments under this bond shall cease, unless or until the Principal shall deposit with the READING COMPANY'S agent, currency, certified check or bank cashier's check in amount equal to 125% of the invoice or value of the property in question or a specific bond of indemnity in amount equal to twice the invoice or value of the property in question, with a corporate surety duly authorized to write surety bonds and regularly engaged in such business.

Since the bill of lading was not delivered within five days after delivery on May 10, 1968, and since Western Flour did not put up any additional security, DiMassa asserts that the coverage under the USF&G bond and thus his individual responsibility was terminated as to the other flour shipments made in May and June of 1968. He alleges this vitiates the entire series of events culminating in USF&G's payment to Reading under the bond and the present indemnification suit by USF&G against DiMassa.

To state his contention is to demonstrate its absurdity. While conceivably a guarantor who was a stranger to the affairs of Western Flour might assert that his liability would be released by a failure to force Western to comply strictly with the terms of the indemnity bond, DiMassa was one of Western Flour's principals as well as being its secretary and counsel. He helped control its affairs and decide what should and should not be done. He could have had Western Flour obtain the shipping documents, put up the required money, or refuse to accept further shipments. He did none of these things and therefore is hardly in a position to suggest that his failure to act provides him with a valid defense to USF&G's claim. And this is true whether the shipment being questioned was received on May 10 or May 28.

Laying aside the weaknesses apparent on the face of DiMassa's allegations, however, the principal basis for General Mills' motion for summary judgment in which Pillsbury, Reading, and ConRail all join, is the statute of limitations. In Pennsylvania, the statute of limitations begins to run when a cause of action accrues. In an indemnity action such as the one USF&G has brought against DiMassa, the statute of limitations begins to run when the indemnitor has paid the amount due or when judgment has been entered. See *Mack Trucks, Inc. v. Bendix-Westinghouse Auto A.B. Co.*, 372 F.2d 18 (3d Cir. 1966), cert. denied, 387 U.S. 930, 87 S.Ct. 2053, 18 L.Ed.2d 992 (1967). In the instant case, the statute of limitations for the indemnity action began to run when USF&G paid the judgment entered against it in the Common Pleas Court of Philadelphia in 1973. Thus, USF&G's indemnity action against DiMassa brought in 1977 is well within the six year limitation for contract actions. DiMassa seeks to benefit from this timely filing by asserting that the indemnity suit tolled the statute of limitations for his third-party action. DiMassa in his third-party complaint attempts to act as a subrogee and assert defenses of fraud and forgery which he argues USF&G should have raised against initial liability. Since DiMassa seeks to stand in USF&G's shoes, he can assert no greater rights than USF&G. Both must be bound by the same statute of limitations for the initial liability which began to run in 1969 when the forgery or missing shipment allegedly occurred. See *Raymond-Dravo-Langenfelder v. Microdot, Inc. v. Maryland Shipbuilding & Drydock Co.*, 425 F.Supp. 614 (D.Del.1976); *Litts v. Refrigerated Transport Co.*, 375 F.Supp. 675 (M.D.Pa.1973); 3 *Moore's Federal Practice*, ¶ 14.09, at 14–248.

Unquestionably, the events surrounding the missing shipment which allegedly prevented recovery under the bond occurred no later than 1969 which in 1977, when this action was filed, was well beyond the Pennsylvania six year statute of limita-

tions. 12 Pa.Stat.Ann. § 31. The fact that conspiracy is mentioned in the third-party complaint does not affect the statute of limitations. The statute of limitations for conspiracy begins to run from each overt act causing damage. *Auld v. Mobay*, 300 F.Supp. 138 (W.D.Pa.1969). The only overt act asserted is the alleged forgery in 1968, more than six years before DiMassa filed his complaint in 1978.

 DiMassa attempts to avoid his statute of limitations problem by alleging fraudulent concealment in his amended complaint. The law in Pennsylvania is clear that to toll a statute of limitations, the fraud must be active, continuing, and perpetrated by an affirmative independent act of concealment. *Knuth v. Erie-Crawford Dairy Conservative Association*, 463 F.2d 470, 481–82 (1972) cert. denied, 410 U.S. 913, 93 S.Ct. 966, 35 L.Ed.2d 278 (1973). Plaintiff must also show that he was not negligent in discovering the fraud. *Iacaponi v. New Amsterdam Casualty Co.*, 258 F.Supp. 880 (W.D.Pa.1966), aff'd, 379 F.2d 311 (3d Cir. 1967), cert. denied, 389 U.S. 1054, 88 S.Ct. 802, 19 L.Ed.2d 849 (1968); *American Automobile Insurance Companies v. Rosamilia*, 25 Pa.D. & C.2d 264 (1961).

In the instant case, there are no specific allegations of concealment while those relating to diligent investigation are conclusory and contradicted by other facts asserted in the third-party complaint. DiMassa was involved in the dealings of Western Flour at the time of the alleged missing shipment. He knew that the proper bill of lading was lacking in 1968. According to ¶ 19 of the Amended Complaint,

> On or before Friday, May 10, 1968, the Reading Company delivered to Western Co. BCK 2282 and its contents without prior surrender of the bill of lading covering the shipment *on Western's advice that the same was outstanding or unavailable* (emphasis added)[2].

DiMassa was also involved in the litigation in this case from 1969 to present. In all that time, he did not uncover the alleged fraud. Then on a visit to Rome, according to his affidavit, he met with D'Onofrio the other principal of Western Flour, who revealed the details of the conspiracy and fraud which had occurred over 10 years before. This affidavit does not show reasonable diligence in investigating the incident.

DiMassa asserts a derivative claim stemming from this missing shipment theory: the third-party defendants fraudulently engaged in litigation and accepted payments in reliance on the bond when they knew that the misrepresentations concerning the bill of lading should nullify bond coverage. Admittedly, the payment for the flour shipments has spawned a series of lawsuits involving the indemnity bond. DiMassa's conclusory allegations regarding the filing of these suits on the bond or failing to defend other lawsuits are insufficient to assert fraud or negligence. Additionally, the negligence claims would be barred by the two year statute of limitations since the completion of the last lawsuit was in 1973 and the third-party complaint was filed in 1978.

 DiMassa's intimate involvement from the beginning with the events culminating in USF&G's liability under the bond and the present indemnity action undermines his fraudulent concealment and due diligence defenses to the statute of limitations. DiMassa was counsel to, secretary of, and a principal in Western Flour at the time of these shipping transactions and must have been aware of the missing bill of lading and the resulting suits. DiMassa was an additional defendant in Reading

---

**2.** Paragraph 19 of the amended complaint conflicts with subsequent paragraphs 22 and 24 which indicate that the Reading Company failed to report the delivery without proper documents of the May 10, 1968, shipment to Western.

If Western Flour's principals failed to comply with the terms of the bond and put up additional security within five days, and also failed to pay for the goods delivered, it is unfair for Western Flour's principals to now assert the lack of bond coverage, which it precipitated, should have barred USF&G from paying and provides a defense to DiMassa asserting rights of subrogation under the bond.

Company's suit against USF&G, yet he never suggested there had been a failure to defend the Pillsbury suit adequately or that General Mills had been paid improperly. I conclude that as a matter of law that neither the summary allegations of due diligence nor the vague reference to concealment is sufficient to toll the running of the statute of limitations against DiMassa.[3]

DiMassa's third-party complaint raises antitrust claims against Pillsbury and General Mills on behalf of Western Flour and American Flour and Bakers Supply Company (AFBS).[4] Western Flour was Pillsbury's exclusive wholesale distributor to the retail bakery industry in the Delaware Valley and adhered to Pillsbury's list prices. From 1958 through 1970, Pillsbury and Western Flour had a distributorship agreement. During those years, Pillsbury allegedly conspired with unnamed co-conspirators to restrain trade unreasonably in bakery flour and fix prices thus depriving Western of profits. Similarly, General Mills agreed to use AFBS as a wholesale distributor of flour to the retail baking industry in Pennsylvania, New Jersey and Delaware from 1964 through 1969. During those years, General Mills and unnamed companies conspired to fix prices and unreasonably restrain trade thus causing AFBS to lose profits.

It is apparent from the face of the complaint that no violations occurred later than 1970. The contentions involving restraint of trade and price fixing must comply with the four-year statute of limitations for antitrust suits. 15 U.S.C. § 15b (1970).[5] DiMassa argues that his allegations are unjust enrichment not antitrust claims. Under this theory, a six year statute of limitations would apply. Even so, DiMassa's claim, filed eight years after the last act injuring his business occurred, must fail. The six year contract statute of limitations would also nullify DiMassa's averments regarding breach of the distributorship agreements. 12 Pa.Stat.Ann. § 31. Allegedly the flour companies sold flour to other distributors or directly to commercial bakers in violation of exclusive dealing agreements. It is undisputed that the agreements terminated in 1970 well beyond the six year limitation period. DiMassa's conclusory accusations of "cover up" and due diligence in investigation do not measure up to the standard of fraudulent concealment necessary to toll the statute of limitations. *General Aircraft Corp. v. Air America, Inc.*, 482 F.Supp. 3 (D.D.C.1979).[6]

Due to the special nature of railroad reorganization, ConRail and Reading advance additional reasons for dismissal of the third-party complaint against them. Pursuant to the Regional Rail Reorganiza-

3. Third-party defendants offer statute of limitations and laches as defenses to the allegations in DiMassa's third-party complaint. Since I find merit in the statute of limitations arguments, I need not discuss the defense of laches.

4. Western Flour and AFBS allegedly assigned to DiMassa all right and title to their price fixing claims against the third-party defendants.

5. DiMassa cannot benefit from USF&G's timely filing of its indemnity action to toll the statute of limitations for these third party antitrust claims. The facts upon which the antitrust assertions are based are entirely foreign to a determination of indemnity. Although the policy of judicial economy may allow claims which have little bearing on the main action to be brought in one lawsuit, this cannot justify a waiver or tolling of a statute of limitations as to these separate claims. Otherwise a party could wait until he was sued, join a third party who would be liable if the defendant were found

liable then tack on a laundry list of grievances from time immemorial which the original defendant has against this third-party defendant. This procedure would totally vitiate the concept of a statute of limitations which starts from the occurrence of the wrongful act.

6. Frankly, DiMassa should be estopped from asserting any fraudulent concealment claim after he had filed in 1970 a suit against Pillsbury Company in Common Pleas Court in Philadelphia alleging the same theories of unlawful restraint of trade, breach of distributorship agreement, and wrongful payment under the bond. That suit ended in a settlement whereby DiMassa released Pillsbury. (The complaint and settlement agreement are attached to Pillsbury's answer to the third-party complaint). In the present action, DiMassa seeks to retract this release but fails to adequately set forth grounds for this change of position.

tion Act, 45 U.S.C. § 701 et seq., ConRail was formed in April, 1976, to take over the operating assets of certain bankrupt railroads, one of which was the Reading Company. In doing so, ConRail did not become a successor corporation which assumed all of Reading's pre-1976 liabilities. However, DiMassa drafted his original third-party complaint on that theory and, except for the mention of Reading in the caption, demanded relief primarily against ConRail. In the amended complaint, DiMassa attempted to correct this deficiency by asking for judgment against ConRail *and* Reading and by alleging that ConRail knew or should have known of the unlawful conspiracy and adopted and ratified it by its acts or omissions. (See Amended Complaint ¶ 42). DiMassa fails to state any specific facts to substantiate this claim. Thus, I will grant ConRail's motion to dismiss.

 Reading moves to dismiss the freight damage claims in the amended third-party complaint, paragraphs 38 and 39, for failure to comply with the timely-filing requirements of the bills of lading and I.C.C. rules and regulations. Under these standards, a freight damage claim must be filed in writing within nine months after the incident. DiMassa states that claims were "made and acknowledged" but not when this was done. Furthermore, the statute of limitations for suit under a standard bill of lading is two years. Certainly, this limitations period expired long ago for damage suits under bills of lading issued in May and June, 1968. DiMassa's broad brush allegations of fraud and conspiracy totally unsupported by specific factual averments cannot serve to toll the statute of limitations. Thus, I will dismiss the freight damage claims in the amended third-party complaint.

Reading also contends that any suit against it must be stayed pursuant to section 77 of the Bankruptcy Act, 11 U.S.C. § 205(j), and Order No. 1 in the proceedings in the reorganization of Reading presently before me. A stay is improper if the suit against Reading involves a claim for damages caused by the operation of trains. I

need not be concerned with a determination of this issue since I will grant Reading's motion based on the statute of limitations and grant summary judgment in its favor.

For the reasons expressed in this opinion, the *motions* of General Mills, Pillsbury, ConRail and Reading will be granted. DiMassa's motion to amend the complaint will be refused since the third-party complaint as amended would not survive a motion to dismiss. *Bernstein v. National Liberty International Corp.,* 407 F.Supp. 709, 715 (E.D.Pa.1976).